**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**


JANE EMSBO and JORGEN EMSBO,

    Plaintiffs,

    v.                                    C.A. No. 11-192L

FIREMAN'S FUND INSURANCE COMPANY,

    Defendant.


<u>**MEMORANDUM AND ORDER**</u>

RONALD R. LAGUEUX, Senior United States District Judge.

    This matter is before the court on cross motions for partial summary judgment, arising from a dispute over the interpretation of a homeowner's insurance policy.  The parties to this case include homeowners Jane Emsbo and Jorgen Emsbo, Plaintiffs, and Defendant Fireman's Fund Insurance Company.  Following the rejection of their insurance claim for water and mold damage, the Emsbos filed this lawsuit.  After amending their complaint, they alleged three counts:  Count I seeks damages resulting from water damage caused by two sudden and torrential rainstorms; Count II seeks damages for loss due to mold, or "fungi," as it is designated in the insurance policy; and Count III alleges that Fireman's Fund acted in bad faith when it denied their claims. On December 1, 2011, this Court granted Defendant's motion to sever Count III until further order of the Court.  For the reasons outlined below, the Court grants Defendant's motion for

summary judgment on Counts I and II, and denies Plaintiffs'
motion.

## Background

Plaintiffs are year-round residents of Block Island, Rhode
Island, where they own a home off Corn Neck Road.  The house was
constructed in 1996, and the Emsbos have lived there since 2002.
In 2010, Defendant issued Plaintiffs an insurance policy for this
property, identified as policy number NZF3483271, effective
January 2010 to January 2011.

The month of March 2010 brought torrential rain and historic
flooding to Rhode Island.  As Jorgen Emsbo described it, the
heavy rains overflowed his house's rain gutters and cascaded
through the slats on a second-floor deck, flooding the ground in
an area where sand had been used as backfill next to the basement
wall.  The water then came through a crack in the foundation,
bringing water and sand into the basement.  Plaintiffs state
that, prior to this, their basement had always been dry; although
Jorgen Emsbo also testified that there was some humidity in the
summer months which had been controlled by the installation of a
french drain and fiberglass paneling along the walls, as well as
the use of a sump pump, fans and, occasionally, a dehumidifier.

After the March rainstorm, the Emsbos removed some of their
waterlogged possessions from the basement.  Jorgen Emsbo hired
local handymen to fix the hole in the foundation.  A mechanical

-2-

engineer by profession, Emsbo testified that he instructed the workmen to excavate around the area of the leak and install a plywood panel and additional sand (and/or concrete and/or spray insulation foam) as a barrier on the outside of the foundation. Within a week, and before these repairs were completed, it rained heavily again, bringing more water and sand into the basement. Emsbo then attempted to fix the problem himself by excavating the same area again, and placing a two-sided plastic sheet (the covering from a king-size mattress) alongside the foundation to control drainage.  Because the Emsbos had previously installed a french drain in the basement, whatever water came into the basement drained out and there was no standing water.

In May 2010, Plaintiffs contacted their insurance agent, Brian Neville, to make a claim.  Plaintiffs did not file a claim at that time, but, at Neville's suggestion, they obtained estimates from professional companies to clean and restore the basement.  Rejecting those estimates as too costly, Emsbo decided to stick with his local workmen and continue to supervise the repair and salvage operation on his own. However, while the rains and the resulting leaks finally subsided, Plaintiffs' problems did not.  During the summer months, they noticed mildew covering many of the possessions that were still in the basement.  These belongings included family heirlooms from Denmark, leather-bound books, Jane Emsbo's teaching materials, clothing, linens,

-3-

photographs and tools.  Many of the items had to be thrown away.

In July 2010, Plaintiffs again contacted their insurance agent, Brian Neville.  Although Neville had been discouraging about the prospect of Fireman's Fund paying a claim for water damage back in May, the Emsbos were determined to pursue the matter further.  In September 2010, Fireman's Fund sent an adjuster to the property to inspect its condition.  On October 1, 2010, Fireman's Fund denied the Emsbos' claim, based on the policy's exclusions for water damage, faulty workmanship and fungi.  This litigation ensued.

## Standard of Review

When ruling on a motion for summary judgment, the court must look to the record and view all the facts and inferences therefrom in the light most favorable to the nonmoving party. Continental Cas. Co. v. Canadian Univ. Ins. Co., 924 F.2d 370, 373 (1st Cir. 1991).  Once this is done, Rule 56(c) requires that summary judgment be granted if there is no issue as to any material fact and the moving party is entitled to judgment as a matter of law.  The analysis required for cross motions for summary judgment is the same.  Scottsdale Ins. Co. v. Torres, 561 F.3d 74, 77 (1st Cir. 2009) ("The presence of cross-motions neither dilutes nor distorts this standard of review.").  In evaluating cross-motions, the court must determine whether or not either party is entitled to judgment as a matter of law based

-4-

upon the undisputed facts.  Id.

## Analysis

Plaintiffs assert that the damage to their home resulted
from the torrential rain storms of March 2010.  The rain fell in
buckets, pouring off their roof, and dripping through the slats
of the deck, falling on the ground surrounding their house.  The
rain then made its way through the foundation and into the
Emsbos' basement, causing damage to the foundation and
ultimately, when mildew set in, to the possessions stored in the
basement.  Jorgen Emsbo testified at his deposition that, "[I]t
was the surface water, the same water that penetrated down below
the surface and went through the basement and/or the foundation."
ECF #24-3 at 41.  The Amended Complaint describes the events as
follows:

> There was no flood on their property but
> surface water at one area of their house
> broke through into their basement.  The land
> is not even close to a flood plain.  The
> water mixed with sand and dirt found its way
> through one unseen small opening in the wall
> and got into the basement.  The events of
> "flooding" were "sudden" as that is usually
> construed.  They were unexpected and of short
> duration (there were two events, over a
> week).

Plaintiffs argue that the insurance policy covers damage from a
sudden rainstorm; or, alternatively, the policy is ambiguous and
must be interpreted in favor of coverage.

Under the heading PROPERTY LOSSES NOT COVERED, the policy

-5-

states:

>2. We do not cover loss or damage caused directly or indirectly by any of the following. Such loss or damage is not covered regardless of any other cause or event that contributes concurrently or in any sequence to the loss:
>
>***
>
>b. Water Damage, meaning:
>
>(1)  flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind; or
>
>(2)  water or water-borne material below the surface of the ground, including water which exerts pressure on, or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure.
>
>(3)  continuous or repeated seepage or leakage of water or steam from any source over a period of weeks, months or years unless such loss is sudden and accidental. Sudden and accidental shall include a physical loss that is hidden or concealed for a period of time. A hidden or concealed loss must be reported to us no later than 30 days after the date appreciable loss or damage occurs and is detected or should have been detected.

The Emsbos argue that damage from rain is different from damage from surface water, and that damage from rain does not fall into the exclusion set forth above.  As the basis for this argument, they cite the "sudden and accidental" language included in section 2(b)(3) set forth above.  They also rely upon the

following section:

> 3. We do not cover loss caused by any of the
> following.  However, any ensuing loss not
> excluded in this policy is covered.
>
> ****
>
> > f.   dampness, dryness or changes in or
> > extremes in temperature, whether
> > atmospheric or not, including any
> > condensation unless damage is to
> > Additional Property Coverage clause
> > 17 – Refrigerated Products or the
> > direct cause of loss is rain, snow,
> > sleet, or hail.

Plaintiffs argue that, if this section does not clearly establish coverage for their losses, then, at least, it creates an ambiguity which must be interpreted in favor of coverage. Defendant asserts that the policy is unambiguous, and that its terms clearly exclude coverage for "water and/or water-borne materials that entered the basement through the foundation."

The Court concurs with Defendant.  This dispute over the interpretation of contractual language is controlled by the Rhode Island Supreme Court's decision in Cheaters, Inc. v. United National Insurance Co., 41 A.3d 637 (R.I. 2012), which held that coverage exclusions must be construed one at a time, and according to their ordinary meaning.  In Cheaters, co-plaintiff holding company's position relied on conflating several different parts of the policy, which it asserted created an ambiguity.  An additional insured on the policy, the holding company argued

that, due to the ambiguous terms, it was not subject to the
exclusions that governed the named insured's coverage.  The Rhode
Island Supreme Court held that "exclusions should be read
*seriatim*, not cumulatively."  Id. at 645.  The Court went on:

> There is no instance in which an exclusion
> can properly be regarded as inconsistent with
> another exclusion, since they bear no
> relationship with one another....We flatly
> reject the concept that, because an exclusion
> excludes certain possible coverage and then
> provides for an exception, that exception
> creates an ambiguity, or an objectively
> reasonable expectation of coverage, when it
> is confronted with another explicit
> exception.

Id. at 645 (internal quotations and citations omitted).

In the present case, the Fireman's Fund policy clearly and
unambiguously excludes coverage for water damage caused by water,
below the surface of the ground, which seeps or leaks through the
foundation.  While the exception to the exclusion set forth in
section 3(f) (no coverage for "dampness....unless...the direct
cause of loss is rain..."), may apply to some circumstances,
there is no need to speculate about what those circumstances may
be because they are clearly and unambiguously <u>not</u> the events that
took place at the Emsbos'.  As the <u>Cheaters</u> Court advises, the
two exclusions have no relationship to each other; they cannot be
read together to create an ambiguity where the language of the
pertinent exclusion is clear and straightforward.

It is black letter law that the policy must be read in its

-8-

entirety and its words must be given their ordinary meaning. Id.
at 643.  No "mental gymnastics" may be employed to create an
ambiguity where none exists by focusing on an isolated word out
of context.  Id.  This Court has reviewed the Fireman's Fund
policy in its entirety.  The policy clearly excludes coverage for
water damage caused by below-grade water seeping through the
foundation into the basement, such as occurred at the Emsbos'
home in March 2010.

### *Mold and mildew*

The Fireman's Fund policy states: "We will not pay for loss
or damage arising, in whole or in part, out of, resulting from,
caused by, or in any way related to **fungi**."  (Emphasis in
original indicates that the word is defined in the policy.)
Plaintiffs cite to a section of the Policy which provides
coverage for mold damage in some circumstances:

> 4. **** If **fungi** is the result of a cause of
> loss otherwise covered in this policy, we
> will pay up to $25,000 on an annual aggregate
> basis for all **property damage** covered under
> the Dwelling, Other Structures, Personal
> Property, and Additional Property Coverages
> and related Loss of Use, caused by or
> resulting from the **fungi**.  This includes the
> cost to test for, monitor, abate, mitigate,
> remove, dispose of, or remediate **fungi**.

The ruling on the subject of water damage controls the issue of
the Emsbos' mold damage.  Because the "fungi" was not caused by a
loss "otherwise covered in this policy," the Emsbos are not

eligible for insurance coverage for the loss of their mildewed belongings.

### *Other issues*

Both parties extensively address the timing of the Emsbos' claim and Defendant's response to it, as well as the quality of the repair work undertaken by Jorgen Emsbo.  Because the Court holds that the Emsbos' losses from water damage and mildew are not covered by the policy, the Court refrains from analyzing these issues.

The Emsbos' Count III alleging that Defendant acted in bad faith was previously severed from the issues resolved herein. Because the Court holds that Defendant acted properly in denying the Emsbos' claim for insurance coverage, the Emsbos will be unable, as a matter of law, to establish that Defendant acted in bad faith.  <u>Skaling v. Aetna Ins. Co.</u>, 799 A.2d 997, 1010 (R.I. 2002); <u>Bibeault v. Hanover Ins. Co.</u>, 417 A.2d 313, 319 (R.I. 1980).  Consequently, under its authority pursuant to Fed. R. Civ. P. 12(f)(3), the Court grants summary judgment in favor of Defendant on Count III of the Amended Complaint as well.

### <u>Conclusion</u>

For the reasons outlined above, the Court grants Defendant's motion for summary judgment on Counts I and II of Plaintiffs' Amended Complaint.  The Court denies Plaintiffs' motion for summary judgment on the same counts.  By order of this Court,

Count III is also dismissed.   The Clerk shall enter judgment for

the Defendant, accordingly.

It is so ordered.


<u>/s/Ronald R. Laqueux</u>
Ronald R. Laqueux
Senior United States District Judge
June 19, 2013